**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

NICOLAS LAMENDOLA,

      Plaintiff,

v.                                     CIV 18-0163 KBM/SCY

THE BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF TAOS
and JOHN DOES 1-10,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court on two motions filed by Defendant Board of County Commissioners for the County of Taos ("Defendant"): a Motion to Dismiss Under Rules 41(b), 16(f) and 37(d)(1)(A) ("Motion to Dismiss for Failure to Prosecute") (*Doc. 77*), filed May 15, 2020, and a Motion for Summary Judgment and Memorandum in Support ("Motion for Summary Judgment") (*Doc. 80*), filed May 26, 2020. These motions were fully briefed on June 18, 2020, and June 24, 2020, respectively. *Docs. 96*; *99.* Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73(b), the parties have consented to me serving as the presiding judge and entering final judgment. *Docs. 3*; *6*; *7.*

Having reviewed the motions, memoranda, and exhibits submitted by the parties, as well as the relevant authorities, the Court finds that Defendant's Motion for Summary Judgment is well-taken. While Defendant's Motion to Dismiss for Failure to Prosecute also has some merit, the Court finds it would not satisfy the interests of justice to dismiss the case on the grounds therein and,

instead, favors resolution on the merits under the summary judgment standard. Accordingly, the Court will grant the Motion for Summary Judgment and deny as moot the Motion to Dismiss for Failure to Prosecute.

## I.    PROCEDURAL BACKGROUND

This case arises from Plaintiff's employment with the Taos County Sheriff's Office between August 2008 and July 2015. *See Doc. 1-A.* On July 26, 2017, Plaintiff filed suit in the Eighth Judicial District, County of Taos, State of New Mexico, alleging discrimination and retaliation in violation of the New Mexico Human Rights Act ("NMHRA"), the Americans with Disabilities Act ("ADA"), and Title VII of the Civil Rights Act of 1964 ("Title VII"). *Id.* at 5-8. Additionally, Plaintiff alleged a state law claim under the New Mexico Tort Claims Act ("NMTCA") for retaliatory discharge in violation of public policy. *Id.* at 8-9.

The Taos County Sheriff's Office removed the action to federal court on February 18, 2018. *See Doc. 1.* In lieu of filing an Answer, the Sheriff's Office moved to dismiss Plaintiff's Complaint on the ground that it was not a suable entity. *Doc. 4.* The Court held a hearing on the Sheriff's Office's motion to dismiss on April 19, 2018. *Doc. 15.* At that hearing, the Court addressed failures by Plaintiff's counsel, Kathryn Hardy, to follow the District's local rules. *See id.* at 3. The Court cautioned Ms. Hardy that when counsel fails to comply with local rules, the Court may be inclined to presume that counsel has not given adequate attention to their briefing. *Id.* at 4. Taking the Sheriff's Office's motion to dismiss under advisement, the Court ordered supplemental briefing, with Plaintiff's brief due on May 4, 2018. *Id.*

On May 5, 2018, Plaintiff's counsel moved to extend the time for filing the supplemental brief. *Doc. 20*. The Court granted that motion, giving Plaintiff until May 11, 2018. *Doc. 21*. However, May 11, 2018, came and went without the filing of the brief. A month later, on June 11, 2018, the Court sent an e-mail to attorneys for both parties indicating that it had received a supplemental brief from the Sheriff's Office but not from Plaintiff and inquiring whether the motion to dismiss was ready for resolution. Ms. Hardy responded the next day, indicating that she had encountered difficulties filing the supplemental brief electronically, had instructed her paralegal to file it on her behalf, but had not realized that the brief was never filed. Still, no filing of the supplemental brief was immediately forthcoming. On June 28, 2018, the Court entered an order giving Plaintiff a new deadline for the filing of his supplemental brief, July 2, 2018, and warning that no further extensions would be granted absent good cause shown. *Doc. 22*. Plaintiff's counsel finally filed the supplemental brief on July 2, 2018. *Doc. 23*.

After considering both parties' supplemental briefs, the Court entered a Memorandum Opinion and Order granting the Sheriff's Office's motion to dismiss but also granting Plaintiff leave to move to amend his Complaint in order to name as a defendant the Board of County Commissioners of Taos County. *Doc. 24* at 14. Plaintiff filed his Second Amended Complaint against Defendant on October 3, 2018, attempting service over a month later. *Doc. 28*. Plaintiff's attempted service did not, however, conform to N.M. Stat. Ann. § 4-46-2 (1978), which requires service on the county clerk. *See Doc. 45* at 14 (noting that Plaintiff

served the Second Amended Complaint on someone named "Renelle Romero," where Defendant identified the County Clerk as "Anna Martinez").

Defendant next moved to dismiss Plaintiff's Second Amended Complaint on the grounds that it was filed outside of the statute of limitations and did not relate back to the filing of Plaintiff's earlier complaint. *Doc. 34.* Pursuant to District Local Rule 7.4(a), Plaintiff's response to that motion to dismiss was due December 20, 2018. D.N.M.LR-Civ. 7.4(a) ("A response must be served and filed within fourteen (14) calendar days after service of the motion."). When no response was filed by the deadline, the Court entered an order directing counsel to file a Notice of Completion of Briefing in the absence of any agreements as to an extension of deadlines by the parties. *Doc. 37.* Four days later, and twenty-five days beyond the deadline, Plaintiff filed his response to Defendant's motion to dismiss. *See Doc. 38.*

The Court denied this second motion to dismiss and required Plaintiff to properly serve Defendant in accordance with § 4-46-2 by June 14, 2019. *Doc. 45.* The June 28, 2019 filing of Defendant's Answer prompted the Court to issue an Initial Scheduling Order and to hold a Rule 16 Scheduling Conference. *Docs. 47*; *48*; *51.* A Scheduling Order, with discovery and pretrial deadlines, followed on August 16, 2019. *Docs. 48*; *52.*

Although the parties agree that Plaintiff provided his Initial Disclosures in early August 2018 (*see Docs. 77* at 4; *87* at 1), Defendant maintains that those disclosures failed to comply with Federal Rule of Civil Procedure 26 and District Local Rules 26.3(d)(1) and (3) because he failed to provide a damage

calculation, a list of all healthcare providers, or HIPAA-compliant releases for medical records. *Doc. 77* at 5. Plaintiff concedes that he "did not include a medical release . . . [or] list all relevant medical providers." *Doc. 87* at 1-2. Instead of moving to compel, however, Defendant sought to obtain the missing information by incorporating it into requests for production, which it propounded on November 22, 2019. *See id.*

On December 18, 2019, Plaintiff provided some signed releases for medical records; however, either he or his counsel altered these releases by striking out certain language, redacting other language, and filling the area designated for identification of the addressee with handwriting. *See id.* at 7-11. According to Defendant, these alterations rendered the releases unusable. *Id.* at 8. Indeed, at least one provider refused to provide documents in response to an "altered" release. *See id.* at 13. Defendant reports that Plaintiff finally provided *one* unaltered release on January 10, 2020, though it was not in the form provided by the District's local rules. *Id.*

After discovery had been underway for five months, the Court held a status conference on January 23, 2020, at which time Ms. Hardy suggested that an extra 60 days would be necessary to complete discovery. *Doc. 59.* Defendant's counsel at that time, Nicholas Autio, broached the topic of discovery delays. *Id.* First, he explained that despite granting Ms. Hardy an extension for written discovery responses, Plaintiff had not provided any responses to Defendant's requests for production. *Id.* at 1. Ms. Hardy responded that she had initially overlooked the requests for production and was working to gather

responses. *Id.* The Court instructed Mr. Autio to notify the Court if he did not receive the outstanding discovery responses within six days. *Id.* Second, Mr. Autio explained that Ms. Hardy had advised that she was leaving Alan Maestas's law firm and that depositions would need to be scheduled with Mr. Maestas. *Id.* Yet, Mr. Autio reported difficulty scheduling depositions with Mr. Maestas.[1] *Id.* The Court instructed Ms. Hardy to convey to Mr. Maestas the importance of scheduling depositions. *Id.* Finally, Mr. Autio indicated that Defendant would oppose a motion contemplated by Ms. Hardy to extend the expert disclosure deadline. *Id.* at 2. The Court instructed Ms. Hardy that if Plaintiff was seeking extensions, he would need to file an *unopposed* motion for extension of deadlines as well as an *opposed* motion to extend his expert disclosure deadline. *Id.* at 2. Twenty-one days later, Ms. Hardy finally filed the contemplated motion for extension of deadlines, but not the motion to extend expert disclosures. *See Doc. 64.*

---

[1] The extent of Defendant's difficulty in scheduling depositions with Ms. Hardy and Mr. Maestas is documented in e-mail correspondence that Defendant submits as Exhibits B and C to his Motion to Dismiss for Failure to Prosecute. These exhibits demonstrate that by at least mid-December counsel for Defendant began requesting deposition dates for early to mid-January. *Doc. 77-B* at 2. Ms. Hardy responded that she did not have availability until after January 20, 2020, but she provided no specific dates of availability. *Id.* In early January, Defense counsel again requested Plaintiff's counsel's availability for depositions. *Doc. 77-C* at 4. After receiving no response, Defense counsel followed up a few days later. *See id.* at 3-4. This time, Ms. Hardy responded, indicating that depositions would need to be scheduled "according to [Mr. Maestas's] calendar," as she would no longer be employed by the firm. *Id.* at 3. Mr. Maestas's office, in turn, offered deposition dates in March, after the close of discovery. *Id.* at 2-3. Defense counsel responded, explaining that he required six deposition dates *before February 25, 2020*, the close of discovery. *Id.* at 2. Mr. Maestas's firm provided two February dates, but later retracted them. *Id.* at 1-2. Following further requests from Defense counsel, Mr. Maestas's firm provided three potential dates, one which fell on the day discovery closed and two which fell outside of the discovery deadline. *Id.* at 1.

On March 18, 2020, Mr. Maestas filed a notice with the Court indicating that Ms. Hardy was no longer associated with his firm and that he was withdrawing as counsel of record in this case. *Doc. 66.* According to the notice, all future communications regarding the case were to be directed to Ms. Hardy at her own firm. *See id.*

At a status conference before the Court on April 6, 2020, Ms. Hardy admitted that Plaintiff had still not propounded written discovery or requested depositions from Plaintiff. *Doc. 68.* She indicated that Plaintiff sought further extensions of discovery and case management deadlines. *Id.* Defense counsel, Brandon Huss, advised the Court that he had not yet received unredacted medical releases or dates of depositions from Plaintiff's counsel, despite requesting them for months. *Id.* at 2.

Two weeks later, Plaintiff filed three separate motions for extensions: one for deposition deadlines, one for expert disclosure deadlines, and one for all pending case management deadlines. *Docs. 71-73.* Defendant filed responses in opposition, and Plaintiff filed an *untimely* consolidated reply. *Docs. 81*; *92* at 1. The Court denied each of Plaintiff's motions on June 16, 2020, concluding that Plaintiff failed to demonstrate good cause to justify the requested extensions. *Doc. 92.* Although Ms. Hardy maintained that her firm change and the COVID-19 pandemic had interfered with her ability to conduct discovery, the Court concluded that she had failed to demonstrate any diligence in moving the case forward from the entry of the Scheduling Order in August 2019. *Id.* The Court specifically noted that Plaintiff requested depositions for the first time on April 6,

2020, three weeks before the close of discovery and eight months after discovery had commenced. *Id.* at 10 & n.2. The Court explained that although it is generally "sensitive to the problems and delays caused by COVID-19, [it] will not allow one party to receive a windfall by simply citing COVID-19." *Id.* at 9.

While Plaintiff's motions for extension were pending, Defendant filed the instant Motion to Dismiss for Failure to Prosecute (*Doc. 77*) and the Motion for Summary Judgment (*Doc. 80*).

## II.   FACTUAL BACKGROUND[2]

On January 9, 2015, all safety-sensitive, commissioned personnel of the Taos County Sheriff's Office, including Plaintiff, were notified that they would be subject to a mandatory random drug screening. *Doc. 80-B* at 0:53-2:23. The drug

---

[2] The Court notes that, in response to many of Defendant's statements of undisputed facts, Plaintiff offers what amounts to argument about the significance of the facts, rather than citations to materials in the record to dispute them. *See* Fed. R. Civ. P. 56(c). While the Court has considered the evidence in the light most favorable to Plaintiff, *see DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 961 (10th Cir. 2017), for purposes of determining the undisputed facts, the Court has disregarded commentary by counsel that runs afoul of Federal Rule of Civil Procedure 56.

Plaintiff also attempts to introduce additional issues of fact. The District's Local Rule 56.1(b) permits a party, in their response to a motion for summary judgment, to "set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion." D.N.M. LR-Civ. 56.1(b). The rule provides, however, that "[e]ach additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies." *Id.* Plaintiff's counsel has neglected to assert additional facts in a manner that complies with this local rule. In failing to do so, she has made it difficult for Defendant to respond and for the Court to identify factual disputes. Even so, Defendant has attempted to ascertain and address Plaintiff's non-conforming additional facts, and the Court will follow suit. But the Court admonishes Plaintiff's counsel that in the future she should more closely observe D.N.M. LR-Civ. 56.1(b), which is an important tool that allows courts to address the facts at issue on summary judgment. Indeed, Plaintiff's counsel must make a better effort to observe *all* of this District's local rules should she continue to practice in federal court.

screening was required pursuant to Taos County Personnel Policy § 5.10(B)(2), which provides that sheriff's deputies are subject to "random and reasonable suspicion testing." *Doc.80-A* § 5.10(B)(2). Under the County's random testing protocol, refusal to submit to such screening was cause for immediate termination.[3] *Id.* § 5.10(E). Plaintiff's January 9, 2015 drug test was administered by Human Resource Development Associates, Inc. ("HRDA") and analyzed by Redwood Toxicology Laboratory, both independent third parties.[4] *Doc. 80-C.*

Before the January 9, 2015 drug test, Plaintiff signed a Drug Test Permission Form, which indicated that his specimen would be tested for THC, Benzodiazepines, Methamphetamines, Cocaine, Opiates, and Oxycodone. *See id.* at 1. He also signed a Laboratory Test Requisition Form, authorizing Redwood Toxicology Laboratory to perform the "tests listed." *See id.* at 2. The only category of test indicated was "Other: 5550," which Plaintiff explains he later learned was a code referring to anabolic steroids. *See id.* at 3; *Docs. 80-J* at 3; *90-1* ¶ 13; *90-2* ¶ 4. Plaintiff maintains that at the time of the January 9, 2015 drug test, he was not informed that his specimen would be tested for anabolic steroids. *Doc. 90-2* ¶ 4.

---

[3] Although Plaintiff does not dispute that the refusal to submit to a drug screening was cause for immediate termination, in response to this statement of fact, he raises an ancillary issue involving Taos County's purported failure to follow Department of Transportation ("DOT") rules and procedures. *Doc. 90* at 3. These assertions, which the Court takes up hereinafter, (*see infra* Part B.1.d), are not accompanied by citations to evidence that contradicts Defendant's statement of fact.

[4] Plaintiff does not dispute that his drug test was administered by HRDA and analyzed by Redwood Toxicology, nor does he dispute that these entities were both third parties. *Id.* at 4. Rather, he maintains that HRDA was not DOT-certified and that it failed to follow DOT procedures. *Id.*

The sheriff's office personnel who were subject to the January 9, 2015 drug screening were instructed, both orally and on the Drug Test Permission Form, to disclose any medications they were taking. *See Docs. 80-B* at 1:40-1:56; *80-C* at 1 (providing a blank for participants to list their medications). On Plaintiff's form, he wrote "None" in the blank designated for "Medications." *Doc. 80-C* at 1. He now asserts in his Affidavit that he was not aware at the time the supplements he was taking might be relevant to the drug test. *Doc. 90-2* ¶ 4.

After participating in the January 9, 2015 drug test, but prior to receiving the results, Plaintiff provided the County with a list of over 30 supplements. *Doc. 80-D*. Plaintiff now clarifies that he did not take all 30 supplements simultaneously. *Doc. 90-2* ¶ 4. Instead, he indicates that he provided the names of all the supplements that he had taken "over the years."[5] *Id.*

The January 16, 2015 report from Redwood Toxicology Laboratory indicated that the urine specimen collected from Plaintiff on January 9, 2015, testified positive for three anabolic steroids: (1) Androstendiol, Androstendione, or Testosterone; (2) Methandrostenolone metabolite(s); and (3) Nandrolone, 19-

---

[5] In his affidavit, Plaintiff states that some of the supplements he took were "pro-hormones, sold over-the-counter (OTC), and legal until the Pro-hormone ban of 2015," which he contends took effect on January 1, 2015, merely days before his January 9, 2015 drug test. *Doc. 90-2* ¶¶ 4, 14. Plaintiff explains that although certain over-the-counter supplements were "pulled off of the shelves on January 1, 2015," there was inadequate time for the substances to leave his system before his January 9, 2015 drug test. *Id.* Although Plaintiff offers his own understanding as to when pro-hormones became illegal and their continued presence in his system following ingestion, he does not provide competent evidence to this effect. Federal Rule of Civil Procedure 56 requires that affidavits used to oppose a motion for summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In the absence of some indication that Plaintiff is competent to testify as to the legality of pro-hormones or how long they remain in a person's system, the Court disregards these assertions by Plaintiff.

Norandrostenodione, or 19-Norandrost metabolite(s). *Doc. 80-E* at 1. As a result, the Taos County Sheriff initiated an internal affairs investigation and placed Plaintiff on paid administrative leave. *Docs. 80-F*; *80-G*; *80-H*.

The Sheriff conducted an internal affairs interview of Plaintiff on February 1, 2015, during which he indicated that Plaintiff was the target of an investigation to determine whether he had used or unlawfully possessed prohibited substances. *Docs. 80-I* at 1:30 to 2:20; *80-J* at 2:3-2:11. The Sheriff asked Plaintiff to explain how the substances detected during his January 9, 2015 drug screening got into his system. *Docs. 80-I* at 11:13-11:16; *80-J* at 9:23-10:9. Plaintiff asserted that the detected substances were from legal, oral supplements that he had purchased over the counter. *Docs. 80-I* at 15:05-18:57; *80-J* at 9:23-12:6. During the course of the interview, Plaintiff gave no indication that he had any underlying medical condition for which he took medication. *See Doc. 80-J.*

Following the interview, Plaintiff entered the County's Employee Assistance Program pursuant to Taos County Personnel Policy § 5.10(F)(2), which governed positive test results. *Doc. 80-K*; *see also Doc. 80-A* at § 5.10(F)(2) ("A classified employee who tests positive for drugs or alcohol are [sic] subject to termination unless they elect to enroll in the County's Employee Assistance Program."). Plaintiff was eligible to return to duty for the Taos County Sheriff's Office on February 13, 2015, following his completion of the program. *Doc. 80-M*.

Plaintiff was drug tested by Taos County for a second time on June 9, 2015. *Doc. 80-N*. At that time, Plaintiff reported taking hormone replacement

therapy for an unspecified medical condition.[6] *Id.* The results of the drug test,

available on June 19, 2015, revealed that anabolic steroids were, once again,

detected in Plaintiff's urine specimen. *Doc. 80-O.* Specifically, Plaintiff tested

positive for: (1) Androstendiol, Androstendione, or Testosterone; and

(2) Drostanolone. *Id.* The report also indicated that the urine specimen provided

was dilute. *Id.* at 1.

Plaintiff suggests that a hormone cream compounded by his pharmacist

caused the second positive test result. *See Doc. 90-2* ¶ 9. He maintains that

"Drostanolone is a known metabolite of his prescribed medications." *Id.* ¶ 14. To

this end, he submits an August 12, 2015 letter from pharmacist Jake Mossman,

RPh, which explains that Plaintiff had been using testosterone replacement

therapy since 2015 and that it is "possible" that this therapy caused a false

positive test for Drostanolone. *Doc. 90-3.*

According to Defendant, after testing positive for anabolic steroids the

second time, Plaintiff provided the Taos County Human Resources Department

copies of his prescriptions from Alden Cockburn, M.D., P.A., and Ira Fine, M.D.

on June 20, 2015. *Doc. 80* ¶ 15*; see also Doc. 80-P* (prescriptions ordered by

Alden Cockburn, M.D., P.A. and Ira Fine, M.D.). Although Plaintiff does not

dispute that he gave Dr. Cockburn's prescriptions to Human Resources on June

20, 2015, (*see Doc. 90* at 6), he also offers his own equivocal and somewhat

contradictory account of providing prescription and medical information to Taos

---

[6] Plaintiff indicates that he "cannot concede or dispute" that he told HRDA that he was taking hormone replacement therapy. *Doc. 90* at 5. But despite his failure to affirmatively concede this statement of fact by Defendant, Plaintiff has not come forward with evidence disputing it.

County. Viewing this evidence in the light most favorable to Plaintiff, this account

suggests that Plaintiff may have provided Dr. Cockburn's prescriptions as early

as January 29, 2015. Plaintiff states:

> I *believe* I gave Defendant information on my medical condition and
> prescriptions I was taking in January, April, March and June 2015,
> as I have medical information from these months, and my practice
> was to give whatever documentation I received to HR, after I
> received it.

*Doc. 90-2* ¶ 15 (emphasis added). He indicates that he gave both Human

Resources and the Sheriff a copy of these prescriptions, along with his formal

Hypogonadism diagnosis and a document showing "very low" hormone levels,

the same day he received them from Dr. Cockburn, on January 29, 2015.

*Doc. 90-2* ¶¶ 5, 10; *see also Doc. 90-6* at 3. He "recalls that he gave Defendant a

copy of his prescription for Axion [sic]" in March 2015. *Doc. 90* at 11; *see also*

*Doc. 90-* 9 (medical records from Dr. Cockburn referencing a March 19, 2015

prescription for Axiron). Plaintiff also remembers forwarding to Taos County a

copy of his prescription refill for Axiron in April 2015. *Doc. 90-2*. He asserts that

he provided Human Resources prescriptions from Dr. Fine in May 2015, as soon

as he received them. *Doc. 90-6* at 3. On the other hand, he also submits that he

provided Dr. Fine's prescriptions in June 2015. *Doc. 90* at 19. And he offers the

following explanation concerning Dr. Fine:

> I believe that I mistakenly stated in the last Affidavit I signed that I
> was not seeing Dr. Fine before my termination, but this was a
> mistake I would like to clarify . . . . I did receive treatment from Dr. Ira
> [F]ine during 2015, before and after my termination.

*Doc. 90-2* ¶ 9. But regardless of any confusion as to when Plaintiff was examined

by Dr. Fine or Dr. Cockburn or when he provided their prescriptions or diagnoses

to Taos County, Plaintiff clearly maintains that he was not taking prescription steroids at the time of his first drug test on January 9, 2015. *See Doc. 90* at 5.

In early July 2015, Renee Weber, Taos County's Human Resources Director, sought clarification concerning Plaintiff's second drug test results from Victor Uralets, PhD., Director of Sports Testing at Redwood Toxicology. *Doc. 80-R.* Specifically, Ms. Weber asked Dr. Uralets to clarify which of the substances detected in Plaintiff's urine specimen were covered by the prescriptions he had provided to Taos County. *Id.* Dr. Uralets responded, confirming that both Nandrolone and Testosterone were covered by the prescriptions Plaintiff provided. *Id.* However, in a separate email, Dr. Uralets clarified that the test results still showed that Plaintiff used at least one unprescribed anabolic steroid, Drostanolone, between January 2015 and June 2015. *Doc. 80-Q* at 1.

Dr. Uralets also noted the diluted nature of Plaintiff's June 9, 2015 specimen, explaining that "diluted urine may be a result of drinking excessive amounts of water prior to sample collection[, and] [e]verybody knows[] that it may reduce concentrations of targeted drugs in urine below detection limits." *Doc. 80-R.* Dr. Uralets explained that the practice of drinking excessive water "is often used by patients[] who are trying to manipulate testing results." *Id.* In a later e-mail, Dr. Uralets again addressed Plaintiff's diluted urine, opining that it was diluted "whether intentionally or not, in order to make detection of target analytes more difficult." *Doc. 80-Q* at 2. Plaintiff asserts that he "did drink water the day of the drug test, as [he] normally would, but not excessive amounts." *Doc. 90-2* ¶ 7.

Given the information provided by Dr. Uralets, Taos County retested Plaintiff on July 3, 2015. *Docs. 80-S*; *80-V* at 2. The results from this third drug test showed a positive result for three substances: (1) Androstendiol, Androstendione, or Testosterone; (2) Nandrolone; and (3) Trenbolone metabolite.[7] *Doc. 80-T.*

---

[7] Plaintiff submits that it is "significant" that Drostanolone was not detected in his third drug test, given his understanding that Drostanolone has a three-month break down period. *Doc. 90-2* ¶ 9. But, again, Plaintiff's affidavit fails to provide *competent* evidence, either as to the significance of a negative result for Drostanolone or the substance's break-down period. *See* Fed. R. Civ. P. 56(c)(4) (requiring that summary judgment affidavits "show that the affiant or declarant is competent to testify on the matters stated"). As such, the Court will disregard these statements by Plaintiff in deciding the present summary judgment motion.

Additionally, Plaintiff makes assertions which at least imply that Undersheriff Steve Miera contaminated his third urine specimen with Tenbolone. Plaintiff contends that Mr. Miera had access to both the urine specimen from his third drug test and a "cattle steroid." *Doc. 90* at 12. He submits that following his drug test on July 3, 2015, the "chain of custody was broken, his drug test was comprised [sic] and not reliable." *Id.* at 7. Plaintiff maintains that the "cattle steroid," or Trenbolone, was not detected in his fourth drug test, which was administered merely 20 days after the third test. *Id.* at 12; *Docs. 90-2* ¶ 18; *90-8*. Accordingly, he suggests that the "only explanation" for Trenbolone being detected in the third test was that it was left open to contamination over a holiday weekend. *Doc. 90-2* ¶ 10. Plaintiff further alleges that his urine was contaminated in retaliation for his arrest of Mr. Miera's brother. *Doc. 90* at 4.

These allegations by Plaintiff are replete with speculation and unsupported by personal knowledge. For example, Plaintiff does not demonstrate personal knowledge as to Mr. Miera's possession of Trenbolone or as to the procedures followed after collection of his urine sample. He is not competent to testify concerning the reliability of his third drug test, nor can he offer opinions regarding a later negative test result for Trenbolone. The Court will disregard these additional factual statements asserted by Plaintiff, which amount to nothing more than conjecture.

Relatedly, Plaintiff contends that he provided "significant evidence that there is a causal link between Plaintiff's involvement in arresting the Undersheriff's brother and the Sheriff's decision to terminate him for pretextual reasons." *Doc. 90* at 12. In support, he refers the Court to what he describes as "actual recordings" of Mr. Miera discussing Plaintiff's drug test and his retaliation against him. *Docs. 90-2* ¶ 22; *90-13*. The Court has reviewed the recordings provided as Plaintiff's Exhibit 13 but disagrees that they constitute evidence of pretextual motives for Plaintiff's termination. Even aside from the poor sound quality and the lack of context or foundation provided by Plaintiff, the content of the recording, so far as the Court can discern, simply does not relate to Defendant's or the Sheriff's rationale for terminating Plaintiff's employment. Instead, the exhibit

On July 10, 2015, Ms. Weber again sought analysis of the third drug test results from Dr. Uralets. *Doc. 80-U*. Ms. Weber explained that Plaintiff's July 3, 2015 drug screening detected a "new" substance, Trenbolone Metabolite, and she inquired whether this substance was "covered by" any of the prescriptions Plaintiff had provided to the County.[8] *Id*. at 1.

Dr. Uralets advised that in Plaintiff's earlier sample, which was diluted, Trenbolone Metabolite "was below detection limit." *Id*. at 2. He further explained that Drostanolone Metabolite, while detected in the July 3, 2015 drug test, "could not be properly confirmed due to interferences from high concentrations of nandrolone and testosterone metabolites." *Id*. Dr. Uralets's explanation prompted further questions from Ms. Weber. *See Id*. at 3. Dr. Uralets went on to explain that Drostanolone, for which Plaintiff tested positive in his second drug test, and Trenbolone, for which Plaintiff tested positive in his third drug test, "were introduced as anabolic steroid drugs 50-60 years ago . . . [and] were scheduled in 1990." *Id*. He opined that these drugs "have practically no medical use," but he admitted that he was not sure whether they were available by prescription in the United States. *Id*. Dr. Uralets noted that both drugs "are commonly found in anabolic steroid testing, because they are readily available on the black market."

---

appears to contain recorded conversations between unidentified persons regarding an ongoing investigation of weapons not unaccounted for and a handgun found in a bag on the floor of an evidence room. *See Doc. 90-13*. In other words, the recording is irrelevant to Plaintiff's claims of pretext and will not be considered by the Court.

[8] Plaintiff argues that "Defendant has not shown that all of Plaintiff's prescriptions were sent to Dr. Uraltess [sic], or if just one, or some, of the prescriptions Plaintiff gave Defendant . . . were sent to Dr. Uraltes [sic]." *Doc. 90* at 8. But Plaintiff's contention is mere speculation. He has not come forward with any evidence that would identify one or more prescriptions that was not provided for Dr. Uralets's consideration.

*Id.* Finally, he confirmed that neither Drostanolone nor Trenbolone were covered by the prescriptions provided by Plaintiff. *Id.*

Given Plaintiff's positive test results for illegal substances in three separate drug tests and the information and opinions provided by Dr. Uralets, the Taos County Sheriff formally recommended termination of Plaintiff's employment on July 14, 2015. *Doc. 80-V*. In his letter recommending Plaintiff's termination, the Sheriff summarized:

> In comparing all of the prescription information you provided to Human Resources with the results of both tests, it is clear that you tested positive for two additional substances both of which are drugs of the Class III Schedule of the Controlled Substances Act . . . , neither of which are covered by any prescription you have presented.

*Id.* at 2.

Thereafter, a Disciplinary Hearing was conducted on July 20, 2015, where Plaintiff was represented by union representatives, and Dr. Uralets provided telephonic testimony. *Docs. 80* ¶ 22; *90-1* ¶ 19. According to Defendant, Dr. Uralets's testimony was consistent with his prior analysis of Plaintiff's test results. *Doc. 80* ¶ 22.

Plaintiff took a fourth drug test on July 20, 2015. *Docs. 90-2* ¶ 13; *90-5*. He submits a report from Clinical Reference Laboratory which he represents contain the results of a test collected from Plaintiff on July 20, 2015, and then reported on July 29, 2015. *See Doc. 90-5*. The results of that drug test have been redacted, however.[9] *See id.*

---

[9] Plaintiff contends that the fourth drug test did not detect either Trenbolone or Drostanolone. *Doc. 90-2* ¶¶ 8, 10, 13. He submits that it follows that "[t]he results of the third drug test, taken on July 3, 2015, were erroneous to the extent that Trenbolone was detected." *Doc. 90-1* ¶ 8. Plaintiff maintains

On July 24, 2015, before the results of Plaintiff's fourth drug test were reported, the Taos County Manager, Stephen P. Archuleta, issued a formal written ruling upholding the Sheriff's recommendation that Plaintiff's employment be terminated for violations of Taos County Personnel Policy § 5.10. *Doc. 80-W*.

## III. LEGAL STANDARD

### A. Motion to Dismiss for Failure to Prosecute

According to the United States Supreme Court in *Link v. Wabash R. Co.*, 370 U.S. 626, 629-30 (1961), courts have the power to dismiss when a plaintiff fails to prosecute. The Court explained:

> The authority of a federal trial court to dismiss a plaintiff's action without prejudice because of his failure to prosecute cannot seriously be doubted. The power to invoke this sanction is necessary in order to prevent undue delays in the disposition of pending cases and to avoid congestion in the calendars of the District Courts. The power is of ancient origin, having its roots in judgments of nonsuit and non prosequitur entered at common law, . . . and dismissals for want of prosecution of bills in equity . . . .

*Id.* at 629-30 (citations omitted). Likewise, the authority to involuntarily dismiss a case for failure to prosecute is recognized by Federal Rule of Civil Procedure 41(b), which confirms: "If the plaintiff fails to prosecute or to comply with these

_____

that Trenbolone has a half-life of five months, and his body did not have "adequate time before the fourth test . . . to clear the metabolites out of his system." *Doc. 90-2* ¶ 8. But the Court's examination of the July 20, 2015 drug test report does not support his underlying contention that Trenbolone was not detected. Aside from a notation suggesting that the test was "positive/abnormal," the results are obscured. *See Doc. 90-5.* Moreover, Plaintiff is not competent to provide evidence as an affiant concerning the half-life of Trenbolone or any implications from the substance's absence in his July 20, 2015 specimen. Accordingly, the Court will disregard these additional statements of fact.

rules or a court order, a defendant may move to dismiss the action or any claim against it."

When evaluating a motion to dismiss for failure to prosecute, a court considers the factors set out in *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992). *See Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1143 (10th Cir. 2007) (noting that the *Ehrenhaus* factors apply when considering dismissal under either Fed. R. Civ. P. 41(b) or the court's inherent authority). The factors are: "(1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; . . . (3) the culpability of the litigant[;] . . . (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance[;] . . . and (5) the efficacy of lesser sanctions." *Ehrenhaus*, 965 F.2d at 921 (10th Cir. 1992) (citations and quotation marks omitted). These factors are not a rigid test but instead "represent criteria for the district court to consider prior to imposing dismissal as a sanction." *Id.* It is within a court's discretion to grant a motion to dismiss if, after considering the relevant factors, it determines "that dismissal alone would satisfy the interests of justice." *Id.* at 918. Even so, the judicial system retains a "strong predisposition to resolve cases on their merits . . . ." *Id.* at 921 (quotation omitted).

### B.   *Motion for Summary Judgment*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute exists where the

evidence is such that a reasonable jury could resolve the issue either way. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A mere scintilla of evidence in the non-movant's favor is not sufficient. *Anderson*, 477 U.S. at 252. However, the court must consider all the evidence in the light most favorable to the party opposing summary judgment. *See Trask v. Franco*, 446 F.3d 1036, 1043 (10th Cir. 2006).

Both the movant and the party opposing summary judgment are obligated to "cit[e] to particular parts of materials in the record" to support their factual positions. Fed. R. Civ. P. 56(c)(1)(A). Alternatively, parties may "show[] that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B); *see also Medlock v. United Parcel Serv., Inc.*, 608 F.3d 1185, 1189 (10th Cir. 2010) ("[I]f the matter in issue concerns an essential element of the nonmovant's claim, the moving party may satisfy the summary judgment standard 'by identifying a lack of evidence for the nonmovant on [that] element.'" (internal quotation and citation omitted) (alteration in original)). Materials cited to establish the presence or absence of a genuine dispute must be in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2).

## III.   ANALYSIS

### A.   *Motion to Dismiss*

Defendant identifies three categories of conduct by Plaintiff and his counsel for the Court's consideration: (1) conduct related to healthcare providers;

(2) conduct related to depositions and discovery; and (3) conduct regarding procedural matters. *See Doc. 77*. Applying the *Ehrenhaus* factors, Defendant maintains that dismissal for want of prosecution is warranted. *Id.*

### 1. Degree of Actual Prejudice to Defendant

Defendant argues that it has been significantly prejudiced by Plaintiff's conduct in this case. *Id.* at 17. For instance, by failing to provide releases in accordance with Local Rule 26, Defendant maintains that Plaintiff impaired its ability to obtain complete medical records related to Plaintiff's medical conditions and treatments. *Id.* Without complete medical records, Defendant contends that it was unable to make informed decisions regarding who to depose and what information to elicit during discovery. *Id.* Beyond Plaintiff's "dilatory conduct" in providing medical releases, Defendant contends that Plaintiff has failed to "engage in the most basic forms of litigation process such as serving written discovery, disclosing witnesses, taking depositions, and actively participating in the case." *Doc. 95* at 4. Defendant submits that if this case proceeds, it will "continue the waste incurred by the County of Taos in defending this claim through unnecessary hurdles and obstacles." *Doc. 77* at 17.

To be sure, the lack of diligence and unfamiliarity with procedural rules exhibited by Plaintiff's counsel has interfered with Defendant's ability to conduct discovery and ultimately its ability to defend this case. When, at the outset of this case, Plaintiff failed to identify the proper defendant under New Mexico law, bringing suit against the wrong entity, Taos County found itself engaged in protracted litigation concerning which party was the proper defendant and

whether the claims asserted in Plaintiff's Second Amended Complaint were made outside the statute of limitations. But Defendant endured further delays and litigation expenses when Plaintiff failed to promptly effect service in the manner required by statute, failed to provide adequate initial disclosures, altered his HIPAA-compliant releases in a fashion that rendered them unusable, and missed deadlines for supplemental briefs, responses to dispositive motions, and discovery responses. Defendant's counsel also found themselves in a frustrating months-long exercise of seeking deposition dates from opposing counsel who was seemingly unwilling to provide dates within the discovery period. And Defendant was required to brief issues, such as opposed motions for extension, brought on by either Plaintiff or his counsel's lack of diligence.

There is no question that the degree of actual prejudice to Defendant from Plaintiff's failure to prosecute this case in compliance with applicable procedural rules has been significant. This factor weighs heavily in favor of granting Defendant's Motion to Dismiss for Failure to Prosecute.

### 2.  Amount of Interference with the Judicial Process

Just as Defendant has endured an unnecessarily lengthy and circuitous route to resolution on the merits, so has this Court. In the process, the Court has been called upon to resolve numerous issues which arose for no reason apart from Plaintiff's counsel's lack of diligence and failure to adhere to procedural rules. Indeed, because Plaintiff's counsel so frequently failed to meet deadlines or to follow procedural rules, the Court found itself in a difficult position: trying to move the case toward resolution on the merits without shepherding Plaintiff's

counsel through each stage of the civil litigation process or becoming an advocate for Plaintiff.

As of April 6, 2020, more than two years and eight months after the filing of his original Complaint, Plaintiff had yet to disclose all of his health care providers, to produce complete and unredacted HIPAA-compliant releases for his providers, to disclose expert witnesses, to take or request a single deposition, or to serve any written discovery on Defendants. Plaintiff had more than enough opportunities to make the required disclosures, to conduct discovery, and to participate in the prosecution of this case. That he did not avail himself of those opportunities, but instead came to the Court seeking extension after extension, shows significant interference with the judicial process. This factor, too, weighs in favor of dismissal.

### 3. Culpability of the Litigant

The culpability of the litigant is somewhat difficult for the Court to assess here, as it is not always clear where the fault for an action or inaction lies. Nevertheless, the fault for missed filing deadlines and the failure to follow procedural rules, which seem to have contributed to the bulk of the delay in this case, falls on Plaintiff's counsel, rather than Plaintiff himself. While Ms. Hardy has at times been quick to blame co-counsel or her staff for delays in this case, she has generally not blamed Plaintiff himself.[10] Given that Plaintiff's counsel,

---

[10] Of the myriad reasons she offers for delays in this case, Plaintiff's counsel identifies only one that might implicate Plaintiff himself: Plaintiff's reluctance to take in-person depositions during the COVID-19 pandemic. *See Doc. 87* at 5. However, under the circumstances, the Court does not find any reluctance by Plaintiff to take part in in-person depositions to be a significant contributor to the delay in this case.

and not Plaintiff, is most culpable for the delays and failure to follow procedural rules in this case, the Court finds that this factor weighs against dismissal of Plaintiff's claims for want of prosecution.

### 4. Prior Warnings from the Court as to Potential for Dismissal

Defendant concedes that the Court has not warned Plaintiff that dismissal would be a likely sanction for noncompliance with the rules. *Doc. 77* at 19. Defendant points out, however, that the Court *did* advise Plaintiff's counsel at an April 19, 2018 hearing that she should review and comply with procedural rules. *Id.* And it submits that despite no explicit warnings about dismissal, the Court provided sufficient warning to Plaintiff and his counsel to litigate his case. *Id.* at 20. Nevertheless, without an explicit prior warning that dismissal was a likely sanction for failure to prosecute, the Court finds that this factor weighs against dismissal here.

### 5. Efficacy of Lesser Sanctions.

Defendant insists that a sanction lesser than dismissal is not likely to be effective. *Id.* at 20. Indeed, Defendant contends that Plaintiff has seemingly disregarded the Court's previous admonishments to read and follow procedural rules. *Id.* Further, Defendant explains that, even when the Court permitted extensions, Plaintiff still failed to engage in discovery or to prosecute his case. It was only after Defendant expressed its intention to seek dismissal for failure to prosecute, at the April 6, 2020 status conference, that Plaintiff sought to take depositions in this case and moved to extend expert deadlines. Finally, Defendant suggests that any sanction lesser than dismissal would likely require

significant modification to the existing deadlines and further expenditure of litigation costs for Defendant with the likelihood of future delay and obstruction ahead. *Id.*

It is of concern that Plaintiff's counsel appears to not fully appreciate her duty to follow procedural rules, to comply with court orders, or to prosecute a case over which she has remained as counsel of record throughout. She offers the following meager explanations for extensive delay in prosecuting this case: that she "was not familiar with [the] requirements of the Local Rules"; that she was not aware that her former firm, Alan Maestas Law Office, would not continue to work on Plaintiff's case after she left the firm; that she encountered difficulties in setting up a new law office, specifically in obtaining an IOLTA Trust Account, licensing her business, and finding a place to scan and copy documents; that she experienced delay in receiving Plaintiff's physical file from her former law firm; and that COVID-19 impaired her ability to both set up her new law office and to litigate this matter. *See Doc. 87*. But these explanations by Plaintiff's counsel do not reassure the Court that some sanction lesser than dismissal would motivate her to prosecute this case with diligence going forward. This factor weighs in favor of dismissal.

Ultimately, while Defendant's Motion to Dismiss for Failure to Prosecute would overall seem well taken and justifiable, the Court cannot say that it would satisfy the interests of justice to dismiss Plaintiff's claims on the basis of his counsel's lack of diligence especially where the Court did not advise him of such a consquence. Instead, the Court favors resolution on the merits under the

circumstances. Where Defendant has established entitlement to summary judgment on the merits of Plaintiff's claims, as discussed below, the Court will deny as moot Defendant's Motion to Dismiss for Failure to Prosecute.

### B.   Motion for Summary Judgment

Plaintiff relies upon alternative theories under the ADA, Title VII, the NMHRA, and the NMTCA, alleging that he was terminated and or placed on administrative leave either (1) as a result of discrimination for an underlying medical condition requiring the use of prescription steroids, or (2) in retaliation for his arrest of a co-worker's brother. *See Doc. 28.*

### 1.   Plaintiff Cannot Make Out a Discrimination Claim Under the ADA, Title VII, or the NMHRA.

In Count I of his Second Amended Complaint, Plaintiff alleges that he suffers from Hypogonadism, for which he was prescribed hormone replacement medication, and that Defendant discriminated against him "based on his disability and/or perceived disability, in violation of the ADA and the NMHRA." *Id.* at 3-5. In Count III, Plaintiff asserts an "alternative" discrimination claim under Title VII and the NMHRA, alleging that Defendant terminated him for "pretextual reasons" after he "criminally charged [his] Lieutenant's brother for [sexual] assault and harassment."[11] *Id.* ¶ 36. Expanding upon this claim in his response brief, Plaintiff suggests that Undersheriff Steve Miera, who is presumably the same person he referred to as "his Lieutenant" in his Complaint, contaminated his third drug test

---

[11] Elsewhere in Plaintiff's Second Amended Complaint, he indicates that he was terminated "for his arrest of Undersheriff Miera's brother on the charge of rape." *Doc. 90* at 20.

by placing Trenbolone in his urine specimen in retaliation for the arrest of his brother.[12] *Doc. 90* at 4, 15-16.

In response, Defendant insists that it terminated Plaintiff for a legitimate, nondiscriminatory reason – because multiple drug tests showed that he used unprescribed, illegal anabolic steroids in violation of Taos County's Personnel Policy. *Doc. 80* at 13.

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Title VII makes it unlawful for an employer "to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The NMHRA is slightly broader, providing that it is unlawful for an employer

> to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of race, age, religion, color, national origin, ancestry, sex, sexual orientation, gender identity, pregnancy, childbirth or condition related to pregnancy or childbirth, physical or mental handicap or serious medical condition.

N.M. Stat. Ann. § 28-1-7(A) (1978).

---

[12] As explained above, Plaintiff submitted what he suggests are "actual recordings" of Undersheriff Miera discussing Plaintiff's drug test and his retaliation against Plaintiff. *Docs. 90-2* ¶ 22; *90-13*. Because the Court finds the audible content of the recordings irrelevant to Plaintiff's claims of pretext, it has disregarded them.

The parties agree that application of the *McDonnell Douglas* framework is appropriate here. *See Docs. 80* at 10; 13; *see also Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (framework applies to ADA discrimination claims); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000) (framework applies to Title VII discrimination claims); *Smith v. FDC Corp.*, 787 P.2d 433 (N.M. 1999) (framework applies to discrimination claims under the NMHRA).

### b. The Court assumes without deciding that Plaintiff has made the requisite prima facie showing of discrimination.

In order to make out a prima facie case of disability discrimination under the ADA or NMHRA, "a plaintiff must demonstrate that he '(1) is a disabled person as defined by the [Acts]; (2) is qualified, with or without reasonable accommodation to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability.'"[13] *EEOC v. C.R. England, Inc.*, 644 F.3d 1028 (10th Cir. 2011); *Trujillo v. N. Rio Arriba Elec. Co-op, Inc.*, 41 P.3d 333, 338 (N.M. 2001).

Addressing the first two elements of his prima facie case in tandem, Plaintiff submits that his Hypogonadism renders him "a qualified individual with a disability for ADA purposes." *Doc. 90* at 13. As best the Court can surmise,

---

[13] Although Plaintiff's Second Amended Complaint also asserts discrimination claims under Title VII, he provides comparatively little in the way of factual allegations or analysis of his Title VII discrimination claim, focusing instead on his disability discrimination claim. Ultimately, the Court's analysis of the second and third steps of the *McDonnell Douglas* framework apply equally to and resolve both Plaintiff's ADA discrimination claim and his Title VII discrimination claim. In the absence of substantial argument or analysis by the parties as to Plaintiff's prima facie case under Title VII, the Court finds it unnecessary and unproductive to delve into its own analysis of that burden.

Plaintiff argues that he requested a fourth drug test as a reasonable accommodation for his disability but nevertheless remained qualified to work as a sheriff's deputy with or without that additional drug test, rendering him a qualified individual with a disability under the ADA. *See id.* Under the third element, Plaintiff insists that Defendant terminated him *because of his disability. Id.* at 13-14. But the allegations and evidence he offers in support are not straightforward. Plaintiff suggests that Defendant's use of his "failed first drug test as a basis for his termination, shows that Plaintiff was ultimately terminated because of his disability . . . because Plaintiff was taking . . . supplements because of his disability." *Id.* at 14. In other words, he alleges that supplements he took for his Hypogonadism caused a positive first drug test, which was a basis for his termination by Defendant. But, in an apparent contradiction, he also insists that he was not yet being treated for Hypogonadism at the time of his first drug test. *Id.* at 5. Indeed, he explains that he was not diagnosed with or prescribed medication for Hypogonadism until January 29, 2015, "and therefore said medication would not have been in the drug tests results before" his first drug test. *Id.* To confuse matters even more, Plaintiff reported during his February 1, 2015 interview that the substances detected in his first drug test were the result of over-the-counter supplements he had taken, but he failed to attribute those supplements to treatment for any medical condition, such as Hypogonadism. *See Docs. 80-I*; *80-J*.

Plaintiff also suggests that disability discrimination is apparent from Defendant's disregard of two documents: an August 12, 2015 letter from his

pharmacist and the results of a fourth drug test. The August 12, 2015 letter conveyed the opinion of Mr. Mossman that "[i]t is possible that [Plaintiff's use of testosterone replacement therapy medication] resulted in a false positive test for [D]rostanolone." *Doc. 90* at 17 (citing *Doc. 90-3*). Significantly, however, the letter is dated after Defendant had already terminated Plaintiff. As such, the Court fails to see how it provides any evidence that Plaintiff's medical condition was a determining factor in his termination. Likewise, the results of Plaintiff's fourth drug test, which Plaintiff submits prove he was not in fact taking Trenbolone, were not available until after Plaintiff's termination. Accordingly, the results of the fourth test also fail to show that Defendant terminated Plaintiff because of a disability.

Plaintiff's prima facie burden is "not empty or perfunctory." *Morgan*, 108 F.3d at 1323-24 (quoting *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 59 (4th Cir. 1995)). On the other hand, the burden is not onerous, and Plaintiff need only offer sufficient evidence to create an inference of discrimination. *See E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1197 (10th Cir. 2000). Given the light burden at this first stage, it is a very close call whether Plaintiff's showing suffices.

Defendant, for its part, insists that Plaintiff cannot make out a prima face case of disability discrimination because Plaintiff's continued use of illegal, non-prescription substances prevents him from demonstrating that he was a "qualified individual with a disability." *Doc. 80* at 11-12. According to Defendant, the decision in *Mauerhan v. Wagner Corp.*, 649 F.3d 1180 (10th Cir. 2011) supports this position. *Doc. 80* at 12.

In *Mauerhan*, the plaintiff sued his employer under the ADA for discrimination on the basis of drug addiction. *Mauerhan*, 649 F.3d at 1182. The Tenth Circuit affirmed the granting of summary judgment in favor of the employer, noting that "an employee or job applicant is not 'a qualified individual with a disability' if he or she 'is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use.'" *Id.* at 1185 (quoting 42 U.S.C. § 12114(a)). The court acknowledged the ADA's safe harbor provision, which exempts individuals who have successfully completed drug rehabilitation programs and those who were "erroneously regarded" as engaging in illegal drug use. *Id.* (citing 42 U.S.C. § 12114(b) and *Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 610 (10th Cir. 1998)).

The plaintiff in *Mauerhan* abstained from the use of illegal drugs for one month prior to termination. *See* 649 F.3d at 1185. Although the Tenth Circuit agreed with the plaintiff's position that "thirty days of sobriety is not insufficient *per se* under the ADA," it nevertheless affirmed the district court's grant of summary judgment in favor of the employer, reasoning that an individual is still "currently engaging in the illegal use of drugs" for purposes of the ADA "if the drug use was sufficiently recent to justify the employer's reasonable belief that the drug abuse remained an ongoing problem." *Id.* at 1186-87 (quoting *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 856 (5th Cir. 1999)). The Tenth Circuit explained that an individual's eligibility for the ADA safe harbor provision "must be determined on a case-by-case basis, examining whether the

circumstances of the plaintiff's drug use and recovery justify a reasonable belief that drug use is no longer a problem." *Id.* (citations omitted).

Viewing the present case through the lens of Plaintiff's allegations, *Mauerhan* is not a perfect factual match. After all, Plaintiff contends that he was discriminated against not on the basis of drug addiction, but on the basis of a medical condition that purportedly necessitated his use of *legal* prescription medication. And Plaintiff does not explicitly rely upon the ADA's safe harbor provision for protection here.

Even so, Defendant's argument – that Plaintiff is not "a qualified individual with a disability" because he was fired for the continued use of illegal drugs – has some logical appeal, and Plaintiff has not directly countered Defendant's argument under *Mauerhan.*[14] However, Plaintiff *has* attempted to demonstrate that his positive drug tests were not the result of his use of *illegal* drugs but of legal, prescribed medications and/or contamination by a co-worker. In other words, he appears to suggest that he was "erroneously regarded" as engaging in illegal drug use.

Ultimately, because this case is not on all fours with *Mauerhan*, and because the parties have provided minimal analysis of Plaintiff's prima facie case

---

[14] For instance, Plaintiff has not argued, as he might, that his completion of a drug rehabilitation program rendered him eligible for the ADA's safe harbor provision. But even if he had made such an argument, the court in *Mauerhan* clarified that an employee's "[m]ere participation in a rehabilitation program is not enough to trigger the protections" of the ADA's safe harbor provision without out some "reasonable assurances that no illegal use of drugs is occurring or has occurred recently enough so that continuing use is a real and ongoing problem." *Mauerhan*, 649 F.3d at 1187 (quoting H.R. Rep. No. 101-596, at 64, 1990 U.S.C.C.A.N. at 573 (1990) (Conf. Rep.)) (emphasis omitted). At a minimum, Plaintiff's subsequent positive drug tests cast doubt on any continued sobriety following his completion of the Employee Assistance Program.

of discrimination under Title VII, the Court concludes that Plaintiff's discrimination claims are better resolved on other, more fully-developed grounds. As such, the Court will assume without deciding that Plaintiff has established a prima facie case of discrimination and will proceed to the next step of the *McDonnell Douglas* burden-shifting framework. *See C.R. England, Inc.*, 644 F.3d at 1043.

### c. Defendant has articulated a legitimate, non-discriminatory reason for its employment action.

Assuming a plaintiff makes the requisite prima facie showing, the burden then shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1038. The Tenth Circuit has described the defendant's burden at this stage of the *McDonnell Douglas* framework as "exceedingly light." *See id.* at 1043.

Here, Defendant insists that the undisputed facts demonstrate that Plaintiff repeatedly failed drug screenings and continued to use illegal anabolic steroids. *Doc. 80* at 13. Defendant submits that Plaintiff's termination on the basis of illegal drug use was "especially reasonable" given his position as a law enforcement officer who interacted with the public in the performance of his duties. *Id.* (citing *Kramer v. City of Jersey City*, 455 F. App'x 204, 206-07 (3d Cir. 2011)). There is no dispute that the Taos County Personnel Policy prohibits the use of illegal drugs by its employees, including outside work hours. That policy also requires safety-sensitive employees, including sheriff's deputies, to participate in random drug screenings.

Plaintiff first underwent a drug test on January 9, 2015. He did not initially disclose that he was taking any medications. Yet, prior to receiving the results,

he provided Taos County with a list of over 30 supplements, which he now alleges included the supplements he took "over the years." Plaintiff does not allege, however, that he made this clarification to Defendant at the time he provided the list or at any time prior to his termination.

In his first drug test, Plaintiff tested positive for three anabolic steroids. When questioned by the Sheriff, Plaintiff insisted that the positive test results were the result of his ingestion of over-the-counter supplements. He gave no indication that he was taking medications or other substances, prescribed or otherwise, for an underlying medical condition. Even now, he maintains that he was not taking prescription steroids for Hypogonadism at the time of his first drug test, on January 9, 2015.

Plaintiff was drug tested a second time on June 9, 2015, and he reported taking hormone replacement therapy for an unspecified medical condition. Plaintiff's second drug test again revealed the presence of anabolic steroids. The report indicated that Plaintiff's urine specimen was dilute.

Sometime between January 29, 2015, and June 20, 2015, Plaintiff provided Taos County copies of prescriptions from his physicians. According to Dr. Uralets, however, the tests showed that Defendant used at least one unprescribed anabolic steroid that was not covered by his prescriptions. Dr. Uralets also noted the diluted nature of Plaintiff's June 9, 2015 urine specimen, opining that the practice of drinking excessive water is often used by patients trying to manipulate their testing results and to make detection of substances more difficult.

Taos County retested Plaintiff for the third time on July 3, 2015. He again tested positive for three substances, including a new substance, Trenbolone, which was not detected in the earlier tests. According to Dr. Uralets, both Drostanolone, for which Plaintiff tested positive in his second drug test, and Trenbolone, for which he tested positive in his third drug test, "are commonly found in anabolic steroid testing, because they are readily available on the black market." *Doc. 80-U* at 3. Dr. Uralets confirmed that neither Drostanolone nor Trenbolone were covered by Plaintiff's prescriptions.

The Taos County Sheriff formally recommended termination of Plaintiff's employment on July 14, 2015, noting that Plaintiff had tested positive for two illegal substances not covered by his prescriptions.

Having considered the record, the Court is satisfied that Defendant easily meets its "exceedingly light" burden to show that its reason for terminating Plaintiff was legitimate and non-discriminatory. More particularly, Defendant has demonstrated a reasonable belief that Plaintiff repeatedly violated the Taos County Personnel Policy by using illegal anabolic steroids while working as a sheriff's deputy.

### d. Plaintiff has failed to demonstrate that Defendant's rationale was pretextual.

When a defendant satisfies its minimal burden to articulate a legitimate, non-discriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual. *McDonnell Douglas*, 411 U.S. at 802-03. That is, the plaintiff must show that "there is a genuine dispute of material fact as to whether the employer's proffered reason

for the challenged action is . . . unworthy of belief." *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995) (citation omitted). To demonstrate pretext, a plaintiff must show that it was "actually false" or that "discrimination was a primary factor in the employer's decision." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (quotation and citation omitted). Typically, this is "accomplished by revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id.* (quotation marks and citation omitted). But, notably, courts generally do not "second guess the business judgment of the employer[,]" and evidence that the employer's decision was mistaken or in poor judgment does not suffice to show that it was unworthy of credibility. *Id.* at 970-71 (quotation and citation omitted). Put another way, the relevant question is whether Defendant's rationale was honestly-held, not whether it was "wise" or "fair." *DeWitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017). And, critically, when evaluating claims of pretext on summary judgment, a court must evaluate a defendant's action "in light of the facts available to the decisionmaker at the time of the decision, not in light of facts that might have been apparent to others or that might have become apparent only in hindsight." *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1211-12 (10th Cir. 2010) (citation omitted).

Plaintiff argues that Defendant's articulated reason for his termination – his use of illegal anabolic steroids in violation of the Personnel Policy – was pretextual. He attempts to demonstrate weaknesses in Defendant's proffered

rationale primarily by showing that the drug test results were unreliable and inaccurate.[15]

Attacking the reliability of his drug tests, Plaintiff insists that Defendant failed to follow Department of Transportation ("DOT") guidelines when it administered his drug tests, leaving them susceptible to contamination. *Doc. 90* at 15. Specifically, he contends that gloves were not worn, that the "administer [sic] put[] test sticks into the urine sample before sealing and sending said sample to the laboratory[,]" and that Plaintiff's specimen for the third drug test was left unattended over the weekend before it was submitted to the laboratory. *Id.* at 15-16. But even apart from Plaintiff's lack of competence to offer opinions as to DOT guidelines or the reliability of drug tests, Plaintiff's arguments are inadequate to demonstrate pretext. He stops short of asserting or providing evidence that any irregularities in Defendant's testing procedures were aimed at discriminating against him because of his disability or his membership in some

---

[15] Plaintiff also attempts to show pretext by speculating that Undersheriff Miera contaminated his urine sample during his third drug test. However, as discussed above, the Court has disregarded these assertions by Plaintiff as mere conjecture. *See supra* note 7 and accompanying text. In addition, Plaintiff points to an alleged statement by then County Manager Stephen Archuleta that if he had known additional facts about Plaintiff's lack of consent to his first drug test, he might not have terminated him. *Doc. 90* at 19. But, as noted by Defendant, factual assertions by Plaintiff which recount statements of third parties constitute hearsay. *See Doc. 98* at 6. Moreover, Plaintiff does not explain how Mr. Archuleta's retrospective questioning of his decision to terminate Plaintiff demonstrates that the decision was pretextual in the first instance. The relevant question is whether, based on the information Defendant had at the time of the employment action, it "honestly believed" the legitimate nondiscriminatory reasons it gave for that action, not whether Mr. Archuleta might have made a different decision if he had different information. As such, Plaintiff fails to create a triable question of fact by providing additional facts related to potential contamination of his third drug test or by reference to hearsay statements by Mr. Archuleta.

protected class. And given the evidence before the Court, such an inference is simply not warranted.

Second, Plaintiff attempts to show that the drug test results on which Defendant based his termination were inaccurate and therefore pretextual. He offers innocent explanations for each of his positive test results. As to the first drug test, he asserts that legal, over-the-counter supplements caused the test to detect the presence of anabolic steroids. *Id.* at 16. According to Plaintiff, he ingested certain supplements at a time when they were legal, but those substances then became illegal while they remained in his system. As explained above, however, Plaintiff provides no competent or specific evidence to support this contention.

As to the second drug test, Plaintiff contends that Drostanolone, for which he tested positive, is a "known metabolite of his prescribed medications." *Id.* at 17. In support, he submits a letter from his pharmacist, Mr. Mossman, in which Mr. Mossman indicates that "[i]t is possible that [Plaintiff's use of testosterone replacement therapy medication] resulted in a false positive test for [D]rostanolone." *Doc. 90-3.* However, because Plaintiff was terminated before Mr. Mossman's letter was even in existence, the letter had no bearing on Defendant's termination decision and therefore fails to provide evidence of pretext.

Plaintiff also addresses Dr. Uralets's opinions concerning the dilution of his specimen during his second drug test, maintaining that any dilution of his urine was entirely unintentional. Plaintiff seizes upon Dr. Uralets's statement that

the dilution of the urine sample was either "intentional or unintentional," maintaining that it was the latter. While Plaintiff admits to drinking water the day of the test, he insists that he drank no more water than he had on the day of every other drug test. But regardless of whether Plaintiff intentionally drank excessive amounts of water before the second drug test, it was reasonable for Defendant to take account of Dr. Uralets's opinion that dilution of a urine sample may indicate a test subject's attempt to avoid detection of illegal substances. Defendant's reliance on Dr. Uralets's opinion to this effect does not evince pretext.

Addressing the third drug test, Plaintiff contends that Defendant's failure to follow certain testing protocols, particularly chain of custody, rendered his test results inaccurate. *Id.* Specifically, he asserts that the third drug test inaccurately reported a positive result for Trenbolone. *Id.* at 18. The problem for Plaintiff is that he offers no competent evidence to support these assertions.[16] And "[m]ere conjecture that [the] employer's explanation is pretext for intentional

---

[16] Plaintiff's suggestion that Defendant's failure to follow DOT procedures afforded Mr. Miera the opportunity to contaminate his urine specimen with Trenbolone is speculative and unsupported by personal knowledge. *See supra* notes 7 & 15. Likewise, Plaintiff is not competent, as an affiant, to assert that Trenbolone would have been detected in his fourth drug test given its purported half-life of five months. *See supra* note 9. And Plaintiff's statement that he "believes that he recalls" that Dr. Uralets testified to Trenbolone's five-month half-life at the January 26, 2016 administrative hearing, *Doc. 90* at 18 (citing *Doc. 90-2*), is speculative and contains hearsay and will therefore be disregarded. Finally, not only is Plaintiff's proffered evidence inadmissible, his logic is flawed. The results of Plaintiff's fourth drug test cannot demonstrate pretext. For, even if Trenbolone was not detected in his fourth drug test, as it was in his third test, the people responsible for terminating Plaintiff's employment were not privy to the results of the fourth drug test at the time he was terminated. Notably, when reviewing Plaintiff's "contention of pretext, [the Court] examine[s] the facts 'as they appear to the person making the decision to terminate." *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1261 (10th Cir. 2001).

discrimination is an insufficient basis for denial of summary judgment." *Morgan*, 108 F.3d at 1323 (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988)).

More importantly, even if Plaintiff could somehow demonstrate that all three of these drug tests were inaccurate – that is, that he did not in fact use any unprescribed, illegal anabolic steroids in 2015 – he still would not have shown that Defendant terminated him because of his disability or because he was a member of a protected class. To the contrary, the evidence demonstrates that once Defendant became aware of Plaintiff's medical condition and treatment, it took affirmative and repeated steps to ensure that Plaintiff's subsequent drug test results demonstrated illegal drug use and were not merely the product of lawful treatment Plaintiff was undergoing for a medical condition. Defendant sought additional analysis and explanation of the drug tests on more than one occasion, specifically inquiring of Dr. Uralets whether Plaintiff's positive test results were "covered by" his prescriptions. Given the information that Dr. Uralets provided to Defendant in response, it was entirely reasonable for Defendant to believe that Plaintiff tested positive for illegal anabolic steroids on three occasions because Plaintiff had in fact used illegal anabolic steroids on at least three occasions.

As to Plaintiff's alternative theory that he was discriminated against because he arrested a co-worker's brother, or that he tested positive because a co-worker contaminated his urine samples, Plaintiff simply provides no admissible evidence to this effect.

There is no dispute that the continued use of illegal anabolic steroids by a sheriff's deputy was a violation of Taos County's Personnel Policy and constituted valid grounds for termination. Defendant's belief that Plaintiff violated the Personnel Policy by using illegal anabolic steroids, even if it turned out to be mistaken, was a reasonable one. Thus, Plaintiff has failed to show weaknesses in Defendant's proffered reason for his termination such that a reasonable fact finder could consider that reason "unworthy of credence." Nor has Plaintiff otherwise come forward with evidence suggesting that unlawful discrimination was a "primary factor" in the decision to terminate his employment.

For all of the foregoing reasons, the Court concludes that Plaintiff has failed to provide evidence from which a reasonable jury could determine that Defendant's reason for terminating his employment was pretextual. Accordingly, the Court grants summary judgment to Defendant as to Plaintiff's discrimination claims under the ADA, Title VII, and the NMHRA.

### 2. Plaintiff Cannot Make Out a Retaliation Claim under the ADA, Title VII, or the NMHRA.

In Count II of his Second Amended Complaint, Plaintiff alleges that he was "retaliated against by Defendants for attempting to initiate a reasonable accommodation dialogue." *Doc. 28* ¶ 29. He maintains that Defendant retaliated against him by placing him on administrative leave the day after he advised that he had a medical condition and by terminating him before it received the test results from his fourth drug test. *Id.* While the Complaint does not expand upon these retaliation allegations, Plaintiff explains in his June 10, 2020 affidavit that he requested the following "reasonable accommodations" from Defendant: (1) an

independent fourth drug test prior to termination; (2) "[c]onsideration of the fact

that Drostanolone was a metabolite of [his] prescription medication"; and

(3) consideration of "the fact that the over the counter steroids that [he] had been

taking for [his] medical condition had just been banned nine days before the

January 9, 2015 drug test." *Doc. 90-2* at 20-21.

Then, in Count III, Plaintiff asserts an "alternative" claim for retaliation

under Title VII and the NMHRA. *Doc. 28* at 8. Factually, Plaintiff alleges that Mr.

Miera retaliated against him for "support[ing] the victim of sexual assault and

harassment [and] criminally charg[ing] the Lieutenant's brother for said assault

and harassment." *Id.* ¶ 36. Plaintiff contends that Defendant, in turn, failed to

investigate Mr. Miera's actions, but instead, terminated him for pretextual

reasons. *Id.* Plaintiff goes further in his response brief, maintaining that the "only

explanation" for Trenbolone being detected in his third drug test was that Mr.

Miera contaminated the urine specimen in retaliation for Plaintiff's arrest of his

brother. Plaintiff, however, was not competent to offer such testimony and the

Court does not consider it herein.

Plaintiff also submitted what he describes as "actual recordings" of Mr.

Miera discussing his drug test and his retaliation against him. *Docs. 90-2* ¶ 22;

*90-13*. Having reviewed the recordings, however, the Court has found them

irrelevant to Plaintiff's claims of pretext and has likewise disregarded them.

As with discrimination claims, the *McDonnell Douglas* burden-shifting

framework applies to retaliation claims. *See C.R. England, Inc.*, 644 F.3d 1028,

1051 (10th Cir. 2011) (applying the framework to retaliation claims under the

ADA); *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 985 (10th Cir. 1996) (applying

the framework to retaliation claims under Title VII); *Otero v. N.M. Corr. Dep't.*,

640 F. Supp. 2d 1346, 1356-57 (D.N.M. June 9, 2009) (applying the framework

to retaliations claims under the NMHRA). First, Plaintiff must make out a prima

facie retaliation case by demonstrating that "(1) he engaged in protected

opposition to discrimination, (2) that a reasonable employee would have found

the challenged action materially adverse, and (3) that a causal connection

existed between the protected activity and the materially adverse action." *C.R.*

*England, Inc.*, 644 F.3d at 1051 (quotation omitted); *Otero*, 640 F. Supp. 2d at

1356-57; *see also Berry*, 74 F.3d at 985 (outlining similar elements of a prima

facie retaliation case under Title VII). Because it is more easily resolved, the

Court takes up Plaintiff's Title VII retaliation claim first.

       Title VII contains an anti-retaliation provision, which prohibits an employer

from "discriminat[ing] against any of his employees . . . because he has opposed

any practice made an unlawful employment practice by this subchapter, or

because he has made a charge . . . under this subchapter." 42 U.S.C. § 2000e-

3a. In order to make out a prima facie case of retaliation under Title VII, a plaintiff

must establish "(1) protected opposition to Title VII discrimination or participation

in a Title VII proceeding; (2) adverse action by the employer subsequent to or

contemporaneous with such employee activity; and (3) a causal connection

between such activity and the employer's adverse action." *Berry*, 74 F.3d at 985

(citing *Love v. RE/MAX of Am., Inc.*, 739 F.2d 383, 385 (10th Cir. 1984)).

Defendant maintains that Plaintiff has "fatally misconstrue[d] the nature of the

first element of his prima facie case" and is unable to show that he was engaged in protected opposition to discrimination. *Doc. 98* at 11. The Court agrees.

Plaintiff asserts that he engaged in protected opposition to discrimination when he supported the victim of sexual assault and harassment by filing criminal charges against his co-worker's brother. But Plaintiff does not explain how his filing of charges against a third party for sexual assault constitutes protected opposition to Title VII discrimination or the participation in a Title VII proceeding. Simply put, sexual assault by a third party outside the workplace is not employment discrimination, nor can it be characterized as an unlawful employment practice by an employer of the variety that Title VII proscribes. As such, Plaintiff's Title VII retaliation claim necessarily fails.

Like Title VII, the ADA also prohibits retaliation, providing in pertinent part that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA]." 24 U.S.C. § 12203. Here, Plaintiff alleges that he was retaliated against for requesting three types of reasonable accommodation: a fourth drug test, consideration of Drostanolone as a metabolite of his prescription medication, and consideration of the once-legal nature of certain over-the-counter supplements. "[A] request for accommodation in and of itself *can* be a protected activity under the ADA." *Otero*, 640 F. Supp. 2d at 1356 (emphasis added) (citation omitted).

Plaintiff, however, must also show a causal connection between his reasonable accommodation requests and Defendant's adverse employment action. A "'causal connection' between a protected action and a subsequent

adverse action can be shown through 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *C.R. England*, 644 F.3d at 1051 (quoting *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007)). Courts have at times concluded that a reasonable jury could find a causal connection based upon a showing of temporal proximity alone. *See, e.g.*, *Otero*, 640 F. Supp. 2d at 1357.

Here, Plaintiff asserts that he apprised Defendant of his Hypogonadism and provided copies of his prescriptions on January 29, 2015, (*see Doc. 90-2* ¶¶ 5, 10), and correspondence submitted by Defendant reveals that he was placed on Administrative Leave just days later, on February 1, 2015 (s*ee Doc. 80-H*). Yet, Plaintiff specifies only the date on which he apprised Defendant of his medical condition, not the dates on which he requested reasonable accommodations for that condition. He does not allege, let alone submit evidence, that there is compelling temporal proximity between his requests for accommodation and Defendant's adverse employment actions. Indeed, Plaintiff's allegations of retaliation appear more akin to speculation than but-for causation. *See Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (explaining that the Supreme Court has likened a plaintiff's causal connection burden to a but-for causation burden, which must be "based on more than mere speculation, conjecture, or surmise") (quotation omitted).

But, even if Plaintiff could make out a prima facie case of retaliation under either the ADA or Title VII, the Court has already determined that Defendant has come forward with a legitimate, non-discriminatory reason for its decision to

terminate Defendant. That same rationale holds when considering Defendant's earlier and related decision to place Plaintiff on administrative leave. Defendant quite reasonably maintains that it took adverse employment action against Plaintiff because he tested positive for anabolic steroids in violation of Taos County's Personnel Policy while serving as a sheriff's deputy, not because Plaintiff requested reasonable accommodate for his medical condition. And, for the reasons discussed above, Plaintiff fails to demonstrate that there is a genuine issue of a material fact as to whether Defendant's reason was pretextual. Plaintiff's retaliation claims under the ADA, Title VII, and the NMHRA cannot survive summary judgment.

### 3. Plaintiff Cannot Establish a Claim for Retaliatory Termination Against Public Policy.

In Count IV of his Complaint, Plaintiff alleges that he "experienced an unlawful termination and other adverse employment actions, against public policy, for being disabled and/or perceived disabled." *Doc. 28* ¶ 43. Alternatively, he asserts that he "experienced retaliation and failure to investigate said retaliation under the NMHRA for his defense of a female that was harassed and discriminated against by Defendants/an employee of Defendants." *Id.* Plaintiff maintains that his conduct was protected by public policy as expressed in NMSA 1978, § 28-1-7(A) & (I). *Id.* ¶ 45.

Defendant points out that any tort claim brought against a governmental entity, such as Defendant here, must be brought pursuant to the New Mexico Tort Claims Act. *Doc. 80* at 21 (citing N.M. Stat. Ann. § 41-4-4(A) (1978)). The Court agrees. Defendant further contends that Plaintiff's claim for retaliatory

discharge against public policy is not a claim for which immunity under the NMTCA has been waived. *Id.* (citing *Silva v. Town of Springer*, 912 P.2d 304, 311 (N.M. Ct. App. 1996)). Once again, the Court agrees.

In *Silva v. Town of Springer*, the New Mexico Court of Appeals reasoned that wrongful discharge in violation of public policy was not a recognized exception to immunity under the NMTCA. 912 P.2d at 311. Plaintiff does not identify any exception to immunity here, and his claim fails for this reason.

But Plaintiff's retaliatory discharge claim fails for a second reason. The doctrine of retaliatory discharge against public policy is a "limited exception to the doctrine of at-will employment." *Silva v. Am. Fed. of State, Cty. & Mun. Emps.*, 37 P.3d 81, 83 (N.M. 2001). As such, it is unavailable to classified employees who enjoy access to other procedural protections. *Id.* Plaintiff does not dispute Defendant's assertion that his employment was governed by the Taos County Personnel Policies and a related collective bargaining agreement or that he was a classified employee. *See Doc. 90-1* at 1 (referencing the Collective Bargaining Agreement and Taos County Personnel Policies governing Plaintiff's employment). As such, the Court is satisfied that Plaintiff is precluded from pursuing a tort claim under the NMTCA for wrongful or retaliatory discharge.

Finally, although an at-will employee may recover in tort when his discharge contravenes a clear mandate of public policy, *Chavez v. Manville Prods. Corp.*, 777 P.2d 371, 375 (N.M. 1989), even an at-will employee must demonstrate that he was terminated "because he performed an act that public policy has authorized or would encourage, or because he refused to do

something required of him by his employer that public policy would condemn."

*Shovelin v. Cent. N.M. Elec. Coop., Inc.*, 850 P.2d 996, 1006 (N.M. 1993)

(quotation omitted). Here, Plaintiff fails to make such a showing. In fact, Plaintiff

does little more than recite the standards for retaliatory discharge and insist that

he has demonstrated a causal connection between protected actions and the

actual reason for his discharge. *See Doc. 90* at 22-23. Plaintiff's claim for

retaliatory discharge is not a viable claim, and summary judgment is granted in

favor of Defendant on this claim.

## IV. CONCLUSION

For all of the reasons above, the Court finds that that there are no material

issues of fact in dispute and that Defendant is entitled to judgment as a matter of

law on all claims.

**Wherefore,**

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss Under

Rules 41(b), 16(f) and 37(d)(1)(A) (*Doc. 77*) is **denied as moot** given that

Defendant's Motion for Summary Judgment and Memorandum in Support

(*Doc. 80*) is well-taken and hereby **granted.**

**IT IS FURTHER ORDERED** that summary judgment will be entered in

accordance with Rule 58 of the Federal Rules of Civil Procedure in favor of

Defendant on all claims and this action will be **dismissed with prejudice.**

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent